NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit
Chicago, Illinois 60604**

Argued November 9, 2009
Decided February 16, 2010

**Before**

TERENCE T. EVANS, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

SAMUEL DER-YEGHIAYAN, *District Judge* [*]

Nos. 09-1895 and 09-2084

| | |
|---|---|
| ESTATE OF TERRY GEE, JR., Deceased, by Special Administrator, Thomas Beeman, *Plaintiff-Appellee*, | Appeals from the United States District Court for the Southern District of Indiana, Indianapolis Division. |
| v. | No. 1:06-CV-00094-WTL-TAB |
| JUDY JOHNSON, Captain, et al., *Defendants-Appellants*. | William T. Lawrence, *Judge.* |

**ORDER**

Terry Gee developed pneumonia while being held as a pretrial detainee in the Monroe County (Indiana) jail. He arrived at the jail on March 18, 2005. Thirteen days later, on March 31, he was transferred to a hospital. He died at the hospital five days later on April 5. The cause of death was "progressive respiratory failure related to adult respiratory distress syndrome and perhaps fluid overload from renal failure."

Gee's Estate brought suit under 42 U.S.C. §§ 1983 and 1988 against two sets of defendants for failure to provide adequate medical care during Gee's 13 days of incarceration

---

[*] The Honorable Samuel Der-Yeghiayan, United States District Judge for the Northern District of Illinois, sitting by designation.

at the jail:  Bloomington Hospital and Health Care System, Inc., Wygonda Rogers, Jennifer Anderson, Trina Estes, and Gwen Sunkel (the Medical Defendants); and Monroe County jail officers Captain Judy Johnson and Sergeant James Edwards (the Jail Defendants).  The Estate also filed claims under state law against the Medical Defendants.  Both sets of defendants brought motions for summary judgment, asserting qualified immunity defenses.  The district court denied the motions.  The defendants bring this interlocutory appeal, arguing that the district court erred in denying their motions.  We begin with the facts, which do not appear to be disputed.

Prior to Gee's detention, Bloomington Hospital contracted with the Monroe County sheriff to provide medical care to county jail inmates.  The hospital agreed to provide a jail doctor, a nurse practitioner, and four licensed practical nurses (LPNs) to care for the inmates on a seven-days-a-week basis.  The hospital was also expected to provide emergency care when needed.  At the time of Gee's detention, Rogers served as the jail's nurse practitioner.  Anderson, Estes, and Sunkel were three of the four LPNs.  Rogers typically worked weekdays and the LPNs covered morning and evening shifts.  None of the nurses worked between 11 p.m. and 4 a.m., but some of the jail officers were trained EMTs.  In addition, jail officers were required to complete two 40-hour training sessions, which included a class on medical considerations for inmates.  Dr. Tim Alward was the jail doctor at the time.  He served a supervisory role and worked a minimum of five hours a week at the jail.  Dr. Alward was usually on call to consult on individual cases, but he was on vacation during the last week of Gee's detention.

Gee was booked into the jail on March 18, 2005, following arrest on a theft charge.  He had been held in the jail on prior occasions and was a known diabetic and schizophrenic.  Rogers ordered that Gee receive a diabetic diet and insulin injections and have his blood sugar level checked twice a day.  The nurses contacted Gee's mother regarding other medications he may have been taking.  Gee's mother subsequently brought his prescriptions to the jail, and they were administered regularly.  During Gee's detention he had contact with a nurse two to four times a day, though he refused insulin injections at times.

A week after Gee entered the jail, Mark Estanislau became his cellmate.  Gee complained to Estanislau that he did not feel well and was in pain; as a result, Gee was not eating much of anything.  According to Estanislau, Gee said he did not want to get Estanislau sick.  Over the next few days, Gee's health went into a rapid decline:  he was falling out of bed, pacing in circles, and suffering from severe back pain.  Estanislau says that Gee asked his mother to urge the staff to send him to the hospital.  Estanislau also notes that he and other inmates repeatedly told the medical staff and jail officers about Gee's condition and said he needed to go to the hospital.

A couple of days after Estanislau and Gee became cellmates, Gee sought treatment from Rogers.  He was coughing and had a sore throat and a temperature of 100.3 degrees.  Rogers believed Gee had the flu and prescribed Benadryl, Robitussin, and Tylenol.

The next day, during the morning medication pass, Anderson noticed that Gee was unsteady on his feet and seemed dizzy. As Anderson checked his blood sugar level, Gee started falling to the floor, and Anderson helped him get into bed. Gee had a fever of 103.7 degrees, a high heart rate, and a respiration rate of 30 breaths per minute.[1] Anderson contacted Rogers, who told her to give Gee some Tylenol to reduce his temperature. His blood sugar, however, remained high, which Anderson attributed to the fact that Gee refused breakfast.

Later that morning, Rogers visited Gee, who complained of back pain and a sore throat. He had a temperature of 100.2 degrees. Rogers concluded he still had the flu and ordered Tylenol, Hydrocodone, Guaifenesin, rest, and fluid intake. When Gee's mother called Rogers to tell her that Gee needed to go to the hospital, Rogers said she was treating Gee's symptoms.

The following day, Anderson visited Gee to check his blood sugar and administer his medications. When Estes relieved Anderson of her shift, Anderson says she told Estes that Gee had the flu. Estes spoke to Gee on the evening medication pass about the importance of taking his medication, getting rest, eating, and drinking fluids. She also checked his breathing, which was short and rapid, and his blood sugar, which was high, even for a severe diabetic like Gee. Estes called Rogers, expecting her to send Gee to the hospital. However, Rogers said she had been treating Gee, and upon hearing his symptoms she concluded that he had a bacterial infection. Rogers prescribed Keflex, an antibiotic, and asked Estes to check Gee's blood sugar again on the evening medication pass. If it exceeded a certain level, Estes was to administer a double dose of insulin.

On the evening pass, some of the inmates, including Estanislau, allegedly told Estes that Gee had not eaten for several days and had passed out that morning. Estes told Gee he needed to eat, drink fluids, and take his insulin. She checked Gee's blood sugar level, which had dropped but was still high, so she gave him a double dose of insulin as well as a double dose of Keflex.

Estes called for Captain Johnson and recommended placing Gee in medical segregation for observation. Johnson admits she overheard inmates saying Gee was sick and not eating and they did not want to catch the flu from him. However, she denies that the inmates said Gee needed to go to the hospital. Johnson approved Gee's transfer to medical segregation and signed an order which stated that Gee had an extremely high blood sugar level and a respiratory condition. Gee was too weak to sign the paperwork or walk, so Johnson wheeled Gee to the segregation cell where Estes and jail officers monitored him. They noted that he was lying down and seemed to be resting. Estes finished her shift around 11:30 p.m., not expecting Gee's condition to worsen.

---

[1] The average adult has respirations of 12-20 per minute at rest and 35-45 during strenuous exercise. http://en.wikipedia.org/wiki/Respiratory_rate (last visited January 15, 2010).

The next morning, March 31, Sunkel was on duty. On the first medication pass, Sunkel gave Gee his prescriptions and tried to persuade him to eat, but she only succeeded in having him drink half a glass of milk. Gee was pale and ashy in appearance and seemed tired and weak, but Sunkel, like the other nurses, believed he had the flu. A couple of hours later, Gee was sleeping and had not eaten. Sunkel gave him additional medications, including Keflex, and noted he was responsive to verbal commands.

About an hour later, Rogers visited Gee and noticed he was dusky and kind of gray in color, which suggested he had a respiratory problem. Rogers believed Gee had developed pneumonia, and she told Sergeant Edwards that Gee needed to go to the hospital. When an officer arrived to take Gee to the hospital a half hour later, Gee was disoriented. He had to be wheeled to the van. Upon arriving at the hospital, the officer sought help in the emergency room. When he returned to the van, Gee was no longer breathing. Gee was taken into the emergency room, where doctors found that Gee had a severe case of pneumonia, his kidneys were not working properly, and he was in critical condition. He died at the hospital five days later, on April 5, 2005.

Several experts who examined Gee's treatment records concluded that his symptoms clearly indicated a need for immediate medical attention and that he should have been taken to the hospital much sooner than he was. They believe Gee received inadequate medical care at the jail. Dr. Alward also testified that Gee should have been taken to the hospital sooner, and Rogers admits, in retrospect, she should have handled things differently.

We review orders denying claims of qualified immunity under the "collateral order doctrine." *Sain v. Wood*, 512 F.3d 886, 890 (7th Cir. 2008). Qualified immunity protects government officials from liability for damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982). A two-part test determines whether qualified immunity exists. Courts look at whether the facts alleged show that the defendants violated a constitutional right, and then they decide whether the right was clearly established. *Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151 (2001). We need not address the two prongs in sequence. *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009).

As a threshold matter, the Estate contends that the Medical Defendants are not entitled to invoke qualified immunity because they are not "state actors." Although in some cases private defendants can claim qualified immunity, this is not one of those cases. In making that determination, we consider the immunity historically accorded the relevant official at common law and the interests behind it. *Malinowski v. DeLuca*, 177 F.3d 623, 627 (7th Cir. 1999) (quoting *Butz v. Economou*, 438 U.S. 478, 508, 98 S. Ct. 2894, 2912 (1978)). But the Medical Defendants fail to provide any evidence that prison nurses (or private hospitals) have historically enjoyed qualified immunity.

Instead, the Medical Defendants argue that they can assert the defense based upon their performance of a governmental function. However, we do not use a functional approach to determine qualified immunity, "especially for a private person who performs a job without government supervision or direction." *Richardson v. McKnight*, 521 U.S. 399, 408-409, 117 S. Ct. 2100, 2106 (1997). The Court in *Richardson* denied the defense of qualified immunity to privately employed prison guards, making special note of the context in which the case arose: a private firm "systematically organized to assume a major lengthy administrative task (managing an institution) with limited direct supervision by the government . . . ." The Court left open the question of whether a private individual "briefly associated with a government body, serving as an adjunct to government in an essential governmental activity, or acting under close official supervision" could assert qualified immunity. *Id*. at 413. The Medical Defendants in our case are in a position that is fairly analogous to that of the defendants in *Richardson*. Their association with Monroe County was not brief, and it seems they performed their jobs with little to no supervision from the Monroe County sheriff. Stephen Sharp, the elected sheriff at the time of Gee's death, maintains that, according to the contract, the hospital was "acting as an independent contractor and not in the capacity of an agent or under an employment relationship with the jail or the county," and the nurses "served as independent contractors for the Monroe County sheriff, not as agents, servants or employees of the sheriff."

So, if push came to shove, we might very well conclude that the Medical Defendants here are not entitled to claim qualified immunity. But push has not come to shove. We need not definitively decide the issue. Like the district court, we take a pass because even if the defense could be claimed by the Medical Defendants, it would be rejected on the merits in this case.

Inmates have a constitutional right to receive adequate medical treatment. *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S. Ct. 285, 290 (1976). Because Gee was a pretrial detainee rather than a convicted prisoner, the Estate's claim falls under the Due Process Clause of the Fourteenth Amendment rather than the Eighth Amendment, but the standards are pretty much the same. *Velez v. Johnson*, 395 F.3d 732, 735 (7th Cir. 2005). To ultimately succeed on its § 1983 claim, the Estate must show deliberate indifference to Gee's medical needs, which involves proving both an objective component--a sufficiently serious medical need--and a subjective component--a sufficiently culpable state of mind on the part of the defendants in denying medical care. *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). To be liable, the defendants must have known of Gee's serious medical need and consciously disregarded that need so as to inflict cruel and unusual punishment upon him. *Johnson v. Doughty*, 433 F.3d 1001, 1010 (7th Cir. 2006).

The Medical Defendants do not put up much of a fight on the objective prong, and the Jail Defendants fully concede that Gee had a serious medical need. A medical condition is sufficiently serious when it has either been "diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Thomas v. Cook County Sheriff's Dep't*, 588 F.3d 445, 452 (7th Cir. 2009). Gee's condition as an insulin-dependent diabetic and schizophrenic, who complained of pain and was not eating,

clearly meets this standard. Accordingly, we focus on whether the defendants were deliberately indifferent.

The Medical Defendants point out that "Gee was not locked into some corner of the jail and ignored by the medical staff." But Gee does not need to show he was literally ignored. *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000). Gee's treatment may be found constitutionally inadequate if it was "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate" his condition. *Greeno*, 414 F.3d at 654 (quoting *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996)). Given the evidence presented by the Estate, a reasonable jury could find that the Medical Defendants provided "blatantly inappropriate" treatment. Gee was a severe diabetic who was experiencing unstable blood sugar levels, suffering intense pain, and refusing to eat or hydrate. He started falling to the floor while Anderson tried to administer insulin, and when Estes decided to move Gee to a segregation cell he could not walk. Furthermore, Gee's mother and other inmates allegedly told the jail and medical staff that Gee needed to go to the hospital. Given these and other allegations, there is a genuine issue of material fact as to whether the Medical Defendants were deliberately indifferent to Gee's needs.

Unlike the Medical Defendants, the Jail Defendants are clearly state actors, and they can assert qualified immunity. While the case is closer against the Jail Defendants, a jury could determine that they, too, were deliberately indifferent to Gee's medical condition. Johnson and Edwards argue that they were entitled to rely on the nurses' judgments, and generally prison officials can defer to medical professionals' opinions. *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009). However, there is an exception when a risk to the prisoner's health is so obvious that a jury may reasonably infer actual knowledge on the part of the defendants. *Vinning-El v. Long*, 482 F.3d 923, 925 (7th Cir. 2007) (citing *Hall v. Bennett*, 379 F.3d 462, 464 (7th Cir. 2004)). This may be one of the rare cases where a layperson would recognize that Gee received treatment so inadequate that Johnson's and Edwards' deference to the nurses was unreasonable. *Johnson*, 433 F.3d at 1011. Gee was clearly in terrible shape, and he was deteriorating right before everyone's eyes. We agree with the district court that it is conceivable Johnson and Edwards should have realized that Gee needed immediate medical care, probably in a hospital.

For these reasons, the district court's judgment is AFFIRMED.