## IRA GREGORY *vs.* JOHN BROOKS.

The defendant, claiming and supposing that he had legal authority as superin-tendent of wharves, ordered the removal of a brig from the plaintiff's wharf where she was discharging, to make room for another vessel to lie at an adjoin ing wharf, whereby the plaintiff lost certain wharfage which he would have received. In an action on the case for damages for the injury to the plaintiff in his contract relation with the captain of the brig, it was held that the ques-tion was not whether the defendant acted without legal right, or even with malice, but whether he was actuated by a positive design to injure the plain-tiff by breaking up the contract relation in question.

It is not enough in such a case to show that the relations between the parties were unfriendly. A person will be protected by the presumptions of the law in the performance of official duties, unless it is clearly shown that his motives are private and malicious, and that he has needlessly used his official power to gratify a spirit of revenge.

And held that it was not necessary that the defendant should have been legally the superintendent of wharves. It is enough if he was such de facto, or hon· estly supposed himself to be such, and believed it to be his duty to make and enforce the order in question.

For the purpose of showing that his acts were done with a private and malicious intent, evidence of any acts of hostility to the plaintiff, with the circumstances under which they occurred, would be admissible. But strong evidence is required to overcome the presumption that a public officer, whose conduct is reasonable in itself, is governed in such conduct by a sense of official duty.

The bringing of cases before the Supreme Court by a motion in error and mo-tion for a new trial combined, is irregular, and the motion will not be treated as a motion for a new trial.

A NEW TRIAL having been granted in this case (35 Conn., 437,) it was tried again to the jury in the Superior Court, upon the general issue with notice, before *Sanford, J.* The defendant in his notice claimed that he was a duly appointed Superintendent of Wharves in the city of Bridgeport, and as such had authority to do the acts complained of in the plaintiff's declaration. The plaintiff's evidence in the case was as follows:

*Ira Gregory*, (*Plaintiff.*) "I owned 100 feet of wharf. Miller & Co. owned 40 feet next north. The railroad company's dock next south was dilapidated and not in condition to use; the sand had worked out in front of it and made a bed, so that vessels could not get up to dock. ·This bed was some fifty feet south of my line. The Nova Scotia brig Brilliant came to my dock with 400 tons coal. We had been unloading her three days; had taken out about 200 tons from the center of the vessel. The bottom of the channel at my wharf· was soft. We were to have $2 per day from the brig for wharfage, and 5 cents per ton from the gas company. The brig was about 100 feet long on her keel. She extended over Miller & Co's wharf the length of her bowsprit and part of her hull, extending pretty much over the whole of Miller & Co's wharf. I went to New York in the morning, and when I came back found the brig lying in the channel outside of two vessels, some twenty rods below my dock or more. The vessel had not over ten feet of hull on Miller & Co's wharf. The planks on the railroad dock were rotten and unsafe for teams. Light draft vessels might lie at the dock." *Question.* "What was the state of feeling toward you on the part of Capt. Brooks at the time of this transaction? Was it friendly or otherwise?" The defendant here objected to the question and to plaintiff's going into any previous transactions between the parties to show the state of feeling on the part of Brooks. The court ruled that such evidence was inadmissible and refused to receive it. The defendant excepted. "The balance of cargo was discharged at a wharf I occupied. It cost me $10 to get it up there."

*Theodore Gregory.* "Am a son of the plaintiff. I saw

Captain Brooks at the time of this transaction; he was at our office three times. The wharf is some 300 or 400 feet from the office. The Housatonic railroad dock was not safe to drive teams on; the bottom next the dock was dangerous. The brig had been three days in discharging; had discharged some 200 tons out of her center. It would not have been safe under the circumstances to haul her back to the railroad dock. I saw the papers which Capt. Brooks gave to the captain of the brig. The first I knew of the transaction was the captain of the brig coming to the office and saying, "Mr. Gregory, who was that man that came aboard my ship last night and showed me these papers?" Some half-hour after Capt. Brooks came down. I was talking with the captain at the time. Capt. Brooks opened the door and said, " Captain, you've got to move that vessel." The captain said it was very strange—that he never was in a port before where he had to move while discharging cargo. Brooks said " The vessel must be moved." I told the captain I didn't think Brooks had any authority. Brooks went away. The barge was from 90 to 100 feet long, and when moored extended along our dock some 45 feet. Capt. Brooks came a second time to our office and said, " Captain, that vessel must be moved." I said, " I don't know, I'll take counsel and see." He then went along; he had a long 12 foot pole in his hand. About an hour after he came again. He came to the office door; didn't come in. Capt. McFee was in the office. Capt. Brooks said, " If you don't haul that vessel away by eleven o'clock, I'll fine you thirty dollars for every tide you lie there." I said, " Capt. Brooks, this will be a great damage to my father and also to the captain." Capt. Brooks turned in an angry and malicious sort of way and said he didn't care whom it damaged; the vessel had got to be moved any how. I told the captain not to stir the vessel an inch; that I would be liable for all damages; that I was going down town to take counsel, and not to move till I got back. I went to take counsel; was gone about half an hour. When I got back the vessel was moved, and the barge was then hauling up to Miller & Co's wharf, and did haul up, so that the captain of

the brig was prevented from coming up afterwards. After Capt. McFee had his vessel made fast outside of another lying alongside, he came up to the office. Miller & Co's elevator was some 10 or 15 feet from our line. The barge brought her second hatchway forward to the elevator, and projected some 45 feet on our dock. After the barge had taken her position, the brig could not unload at our dock, and could not with safety haul back far enough to discharge at the railroad dock, on account of a bank in the channel."

*Cross-examined.* " I have seen the bank at low water, and have tried it with a pole. When I came back from consulting counsel, I told the captain I had seen them and found I was right."

*James Morris.* " I am mate of the brig Brilliant. I was on board the brig on the 26th of September, when Capt. Brooks came aboard about 10 o'clock in the morning. He asked if I was the mate. I told him I was. He then read two papers to me and left them on board, and told me to give them to the captain; and told me he would put on thirty dollars more fine if we disobeyed the order. I told him I would acquaint the captain when he came aboard, and I did so. He also read over some printed paper which he said was the by-law of the port. The papers which he read were these"— (which were shown and laid in by the counsel for the plaintiff.)

" Bridgeport, Sept. 25, 1866. To the Captain or the officer in command of the brig Brilliant, of St. Johns, now lying at the wharf in the harbor and city of Bridgeport: You are hereby ordered and commanded to haul said vessel astern and far enough to permit the canal boat to obtain a berth at the elevator on the wharf of Miller & Co., on or before eleven o'clock this day, under penalty of thirty dollars for neglecting to obey. JOHN BROOKS, Harbor Master and Superintendent."

" Bridgeport, Sept. 25th, 1866. This is to certify that Capt. John Brooks is duly authorized to act as Harbor Master and Superintendent to regulate vessels, &c., lying at the

wharves in Bridgeport, according to the act of the legislature. MUNSON HAWLEY, Mayor."

*Thomas McFee.* "I am master of the brig Brilliant, of St. Johns, New Brunswick. Her registered tonnage is 262 tons. I arrived with the brig at Bridgeport harbor on the 21st of September, and moored to the wharf of Ira Gregory on that day. She was loaded with a little over 400 tons of coal, consigned to H. W. Benedict & Co., New Haven. I commenced discharging at the wharf on the 21st of September, and continued discharging until the 26th of September, on which day I was away from the vessel a short time in the morning, and on my return, about 10 o'clock, I found the notice before mentioned and the certificate. When I came back to the vessel Capt. Brooks was at the dock. He told me he had left the papers above referred to on board, and that I would have to move. I told him I shouldn't move, but that if I had to move, I should haul out into the stream instead of hauling astern. I gave as a reason that my vessel was then about half discharged, and the cargo was taken out of the center and what was left was in both ends, and the vessel was in no position to lie anywhere except in her bed. I also said if I hauled astern far enough to let the canal boat come in, the bow of the boat would be in the bed and the center would be on the ground. I think it would have been dangerous to haul the brig astern as directed. I had examined the ground in the morning when the tide was out. Capt. Brooks went away and returned again about 11 o'clock the same forenoon. He didn't come aboard. The night before, Capt. Brooks came on board the brig and introduced himself as Capt. Brooks, and told me the city had appointed a Superintendent, or Superintendents, to move vessels when they pleased. I understood him to say that they had power to move vessels when they pleased, and I asked him if they had imperial power, and he said they had. The next day at eleven o'clock in the forenoon or thereabouts I moved away, for fear of getting into the law. Capt. Brooks told me that morning that if I wasn't hauled out by eleven o'clock I would be fined thirty dollars, and that he would have me in court

in two hours, I think. · I hauled off in consequence of Capt. Brooks's notice, his representations, and his threats that I should be.fined and brought into court. I had never been in Bridgeport before. I was ready and willing and able to pay the plaintiff his proper charge for wharfage."

The plaintiff having rested his case, the defendant moved for a non-suit, which was ordered by the court, and the plaintiff thereupon moved that the non-suit be set aside, which the court refused to do. The plaintiff thereupon filed a motion in error for the error of the court in refusing to set aside the non-suit, and also for a new trial for error in the rejection of evidence offered by the plaintiff.

*Treat* and *Blake*, in support of the motions.

1. The inquiry as to the defendant's state of feeling towards the plaintiff at the time of the transaction was relevant for the purpose of proving malice, and should have been admitted. This court in its former decision in this case (35 Conn., 437,) held that the " case turns on the existence of a malicious design." It also held that proof of want of reasonable care in the defendant · as to transcending his authority was not sufficient proof of malice, as he might' have been acting in good faith notwithstanding. On the second trial therefore, having proved the same reckless acts as on the former trial, we tried to go farther and show a hostile feeling behind them, and this attempt the court suppressed as irrelevant. The question is even more relevant for the purpose of proving malice than the question always allowed in murder trials as to the existence of a prior quarrel between the parties, or in the cross-examination of witnesses as to former controversies. The question here relates to a hostile feeling *at the time of the transaction.* ·

2. The court erred in deciding that the plaintiff had not made out a *primâ facie* case. 1st. We proved all the acts which the jury in the City Court found to be satisfactory evidence of malice, even after the testimony of the defendant in reply. 2d. We proved by Theodore Gregory that the defendant acted in " an angry and malicious" manner in the

Gregory *v.* Brooks.

transaction. 3d. We tried to prove an angry and hostile feeling on the part of the defendant, which was excluded on the ground that, even admitting it to be proved, it was irrelevant.

*Beardsley* and *Sumner*, contra.

1. The court properly refused to set aside the non-suit. The issue on trial was, whether the defendant in the particular transaction in question had acted with "a malicious and fraudulent design to injure the plaintiff," ( *Gregory* v. *Brooks*, 35 Conn., 437,) and on this issue the plaintiff failed to make out a *primâ facie* case, and so was properly non-suited. Gen. Stats., tit. 1, sect. 181; *Wentworth* v. *Leonard*, 4 Cush., 414; *Smith* v. *Sanger*, 3 Barb., 360; *Scott* v. *Simpson*, 1 Sandf. Sup. Ct. R., 601; *Bailey* v. *Kimball*, 6 Fost., 351; *Long* v. *Lewis*, 16 Geo., 154. There is no testimony in the case, unless it be that of Theodore Gregory, pointing at all to any malice on the part of the defendant towards the plaintiff; and he testifies merely that he informed the defendant that his action would be a great damage to his father (the plaintiff,) and also to the captain of the brig; and that the defendant turned in an angry and malicious sort of way, and said, "he didn't care whom it damaged; the vessel had got to be moved anyhow." This testimony, if admissible at all, is equivocal. *Newell* v. *Woodruff*, 30 Conn., 492, 499.

2. The interrogatory to Ira Gregory, asking for the state of feeling between the plaintiff and defendant, was improper, and the evidence called for was rightly ruled out. It called for irrelevant testimony, and would involve the introduction of still other irrelevant testimony. *Fry* v. *Bennett*, 28 N. York, 324, 327; *Howard* v. *Sexton*, 4 Comst., 157; Roscoe's Ev., 293.

BUTLER, C. J. This case comes before us irregularly, by motion in error and motion for a new trial combined. It is one of the many irregularities which have crept into our practice in relation to the manner of bringing cases before this court, and which constrained us, during the present cir-

cuit, to promulgate anew the rules by which that practice should be governed. The case must not be deemed a precedent in that respect, for hereafter no case coming before us in the same manner, will be heard as on a motion for a new trial.

We are all satisfied that the non-suit was properly granted as the evidence stood. The question in the case is not simply whether the defendant acted improperly, or without strict legal right, or even maliciously, but whether he was actuated in making and enforcing the orders complained of by a design and intention to break up the contract relation existing between the plaintiff and the captain of the brig Brilliant, and thereby injure the plaintiff by preventing him from acquiring his expected wharfage. The case turns on the proof of *that design*, and the evidence in the case does not furnish any such proof on which a jury could properly find a verdict, nor in our opinion would the evidence have been sufficient if the plaintiff had shown that the relations between him and the defendant were unfriendly. Every positive, energetic and independent man is liable to have enemies, and to have an unfriendly state of feeling existing between him and other individuals. When such a man accepts an office whose duties, properly exercised, will necessarily bring him in conflict with the interests and prejudices of others, and those with whom his relations are not friendly, his motives will naturally be suspected and impugned; but he will be protected by the presumptions of the law in the performance of the duties required of him, unless it is clearly shown that his motives are private and malicious, and that he has wantonly and unnecessarily used the power incident to his official station to gratify a personal spirit of revenge. We discover nothing in this case which rebuts the presumption that the defendant was acting under a sense of official responsibility and with a view to an honest discharge of public duty.

The brig Brilliant had lain at the wharf of the plaintiff from the 21st to the 26th of September, covering part of the wharf of Miller & Co. Miller & Co. had a grain elevator upon their wharf, and there was a canal boat lying in the stream loaded with grain consigned to them which could not

come to their wharf and elevator because it was in part occu-
pied, as well as the wharf of the plaintiff, by the brig.    The
defendant was superintendent of wharves, or supposed him-
self to be, and had in his possession the certificate of the
mayor that he was, and it is to be presumed was acting right-
fully in ordering the brig to be hauled astern.   It is immate-
rial whether  he was  harbor master  or not, for the duty of a
harbor master  is to  regulate  the location of vessels in the
stream.    It is sufficient that he was the superintendent of
wharves, de jure or de facto, or honestly supposed himself to
be such, and believed it to be his duty to order the brig astern
and permit the barge to haul in, so that both might be accom-
modated, and  acted accordingly and  did not act with the
design imputed to him.    The object and purpose of his order
appeared upon its face.    It was a  reasonable and  proper
order under the circumstances and  one which it appertained
to his office to give.    The brig had already covered the
wharf of Miller & Co. and excluded the barge for five days,
and but half her cargo was discharged, and five days more
would have been required to complete the discharge.    That
would have been an unreasonable time to have kept the
barge lying in the stream waiting the convenience of the
plaintiff and probably subjecting Miller & Co. to heavy de-
murrage.    Under such circumstances it was the right of
Miller & Co. to have the brig hauled astern far enough to
permit the barge to come to their wharf, and the clear and
imperative duty of the defendant to give the order that he
gave, and enforce it energetically and determinedly.   If for
any good reason  the brig could not be hauled astern safely,
and the plaintiff had another wharf where the brig could be
unloaded, as it appears he had, the defendant would have
been justified in ordering the captain of the brig to remove
his vessel to the other wharf, where he did move it, to com-
plete her discharge, for the barge could be unloaded at no other
place than at the wharf and elevator of Miller & Co.   Such
an order would have been nothing more than enforcing good
neighborhood, and a just regard for their mutual rights and
accommodation, between those adjoining wharf owners.

The presumption alluded to, and the inference arising from this state of facts, that the defendant was governed in his conduct by a sense of official duty, and not by a design to injure the plaintiff through his contract relation as wharfinger with the captain of the Brilliant, is exceedingly strong; and the fact, however clearly proved, that the personal relations of the plaintiff and defendant were unfriendly, would be entitled to little, if any, weight to rebut the presumption or negative the inference, and if that was all the plaintiff sought to prove we should affirm the judgment without hesitation.

But it appears from the motion for a new trial that the plaintiff proposed to go beyond the mere state of unfriendliness in his proof, and how far and with what effect he would have done so if permitted we are unable to see. We think he should have been permitted to prove any acts of hostility and the circumstances under which they occurred, from which an inference could be drawn, consistently with the rules of law in other respects, that the plaintiff was governed in his conduct by the design imputed to him and which constitutes the gist of the action. Because such evidence was excluded we feel constrained to grant a new trial. But we deem it our duty to say that, unless the plaintiff can produce evidence, other than that of mere unfriendliness, to rebut the presumption that the defendant as an officer was acting from right motives, and the supporting inference arising from the fact that a case existed calling imperatively for his official interference in some way for the protection of Miller & Co., the non-suit should be promptly renewed.

In this opinion the other judges concurred; except CARPENTER, J., who did not sit.