(Slip Opinion)          OCTOBER TERM, 2011          1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## FILARSKY *v.* DELIA

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 10–1018.   Argued January 17, 2012—Decided April 17, 2012

Respondent Delia, a firefighter employed by the City of Rialto, Califor-
nia, missed work after becoming ill on the job.  Suspicious of Delia's
extended absence, the City hired a private investigation firm to con-
duct surveillance on him.  When Delia was seen buying fiberglass in-
sulation and other building supplies, the City initiated an internal af-
fairs investigation.  It hired petitioner Filarsky, a private attorney, to
interview Delia.  At the interview, which Delia's attorney and two
fire department officials also attended, Delia acknowledged buying
the supplies, but denied having done any work on his home.  To veri-
fy Delia's claim, Filarsky asked Delia to allow a fire department offi-
cial to enter his home and view the unused materials.  When Delia
refused, Filarsky ordered him to bring the materials out of his home
for the official to see.  This prompted Delia's attorney to threaten a
civil rights action against the City and Filarsky.  Nonetheless, after
the interview concluded, officials followed Delia to his home, where
he produced the materials.

 Delia brought an action under 42 U. S. C. §1983 against the City,
the Fire Department, Filarsky, and other individuals, alleging that
the order to produce the building materials violated his Fourth and
Fourteenth Amendment rights.  The District Court granted summary
judgment to the individual defendants on the basis of qualified im-
munity.  The Court of Appeals for the Ninth Circuit affirmed with re-
spect to all individual defendants except Filarsky, concluding that he
was not entitled to seek qualified immunity because he was a private
attorney, not a City employee.

*Held:* A private individual temporarily retained by the government to
carry out its work is entitled to seek qualified immunity from suit
under §1983.  Pp. 4−16.

Syllabus

(a) In determining whether the Court of Appeals made a valid distinction between City employees and Filarsky for qualified immunity purposes, this Court looks to the general principles of tort immunities and defenses applicable at common law, and the reasons the Court has afforded protection from suit under §1983. See *Imbler* v. *Pachtman*, 424 U. S. 409, 418. The common law as it existed in 1871, when Congress enacted §1983, did not draw a distinction between full-time public servants and private individuals engaged in public service in according protection to those carrying out government responsibilities. Government at that time was smaller in both size and reach, had fewer responsibilities, and operated primarily at the local level. Government work was carried out to a significant extent by individuals who did not devote all their time to public duties, but instead pursued private callings as well. In according protection from suit to individuals doing the government's work, the common law did not draw distinctions based on the nature of a worker's engagement with the government. Indeed, examples of individuals receiving immunity for actions taken while engaged in public service on a temporary or occasional basis are as varied as the reach of government itself. Common law principles of immunity were incorporated into §1983 and should not be abrogated absent clear legislative intent. See *Pulliam* v. *Allen*, 466 U. S. 522, 529. Immunity under §1983 therefore should not vary depending on whether an individual working for the government does so as a permanent or full-time employee, or on some other basis. Pp. 4–11.

(b) Nothing about the reasons this Court has given for recognizing immunity under §1983 counsels against carrying forward the common law rule. First, the government interest in avoiding "unwarranted timidity" on the part of those engaged in the public's business—which has been called "the most important special government immunity-producing concern," *Richardson* v. *McKnight*, 521 U. S. 399, 409—is equally implicated regardless of whether the individual sued as a state actor works for the government full-time or on some other basis. Second, affording immunity to those acting on the government's behalf serves to "'ensure that talented candidates [are] not deterred by the threat of damages suits from entering public service.'" *Id.*, at 408. The government, in need of specialized knowledge or expertise, may look outside its permanent workforce to secure the services of private individuals. But because those individuals are free to choose other work that would not expose them to liability for government actions, the most talented candidates might decline public engagements if they did not receive the same immunity enjoyed by their public employee counterparts. Third, the public interest in ensuring performance of government duties free from the distractions

Syllabus

that can accompany lawsuits is implicated whether those duties are discharged by private individuals or permanent government employees. Finally, distinguishing among those who carry out the public's business based on their particular relationship with the government creates significant line-drawing problems and can deprive state actors of the ability to "'reasonably anticipate when their conduct may give rise to liability for damages,'" *Anderson* v. *Creighton*, 483 U. S. 635, 646. Pp. 11−13.

(c) This conclusion is not contrary to *Wyatt* v. *Cole*, 504 U. S. 158, or *Richardson* v. *McKnight,* 521 U. S. 399. *Wyatt* did not implicate the reasons underlying recognition of qualified immunity because the defendant in that case had no connection to government and pursued purely private ends. *Richardson* involved the unusual circumstances of prison guards employed by a private company who worked in a privately run prison facility. Nothing of the sort is involved here, or in the typical case of an individual hired by the government to assist in carrying out its work. Pp. 13−15.

621 F. 3d 1069, reversed.

ROBERTS, C. J., delivered the opinion for a unanimous Court. GINS-BURG, J., and SOTOMAYOR, J., filed concurring opinions.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

---

No. 10–1018

---

## STEVE A. FILARSKY, PETITIONER *v.* NICHOLAS B. DELIA

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[April 17, 2012]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

Section 1983 provides a cause of action against state actors who violate an individual's rights under federal law. 42 U. S. C. §1983. At common law, those who carried out the work of government enjoyed various protections from liability when doing so, in order to allow them to serve the government without undue fear of personal exposure. Our decisions have looked to these common law protections in affording either absolute or qualified immunity to individuals sued under §1983. The question in this case is whether an individual hired by the government to do its work is prohibited from seeking such immunity, solely because he works for the government on something other than a permanent or full-time basis.

I

A

Nicholas Delia, a firefighter employed by the City of Rialto, California, became ill while responding to a toxic spill in August 2006. Under a doctor's orders, Delia missed three weeks of work. The City became suspicious

of Delia's extended absence, and hired a private investigation firm to conduct surveillance on him. The private investigators observed Delia purchasing building supplies—including several rolls of fiberglass insulation—from a home improvement store. The City surmised that Delia was missing work to do construction on his home rather than because of illness, and it initiated a formal internal affairs investigation of him.

Delia was ordered to appear for an administrative investigation interview. The City hired Steve Filarsky to conduct the interview. Filarsky was an experienced employment lawyer who had previously represented the City in several investigations. Delia and his attorney attended the interview, along with Filarsky and two fire department officials, Mike Peel and Frank Bekker. During the interview, Filarsky questioned Delia about the building supplies. Delia acknowledged that he had purchased the supplies, but claimed that he had not yet done the work on his home.

During a break, Filarsky met with Peel, Bekker, and Fire Chief Stephen Wells. Filarsky proposed resolving the investigation by verifying Delia's claim that he had not done any work on his home. To do so, Filarsky recommended asking Delia to produce the building materials. Chief Wells approved the plan.

When the meeting resumed, Filarsky requested permission for Peel to enter Delia's home to view the materials. On the advice of counsel, Delia refused. Filarsky then asked Delia if he would be willing to bring the materials out onto his lawn, so that Peel could observe them without entering his home. Delia again refused to consent. Unable to obtain Delia's cooperation, Filarsky ordered him to produce the materials for inspection.

Delia's counsel objected to the order, asserting that it would violate the Fourth Amendment. When that objection proved unavailing, Delia's counsel threatened to sue

the City. He went on to tell Filarsky that "[w]e might quite possibly find a way to figure if we can name you Mr. Filarsky. . . . If you want to take that chance, you go right ahead." App. 131–132. The threat was repeated over and over: "[E]verybody is going to get named, and they are going to sweat it out as to whether or not they have individual liability . . . ." "[Y]ou order him and you will be named and that is not an idle threat." "Whoever issues that order is going to be named in the lawsuit." "[W]e will seek any and all damages including individual liability . . . . [W]e are coming if you order this." "[M]ake sure the spelling is clear [in the order] so we know who to sue." *Id.*, at 134–136, 148–149. Despite these threats, Filarsky prepared an order directing Delia to produce the materials, which Chief Wells signed.

As soon as the interview concluded, Peel and Bekker followed Delia to his home. Once there, Delia, his attorney, and a union representative went into Delia's house, brought out the four rolls of insulation, and placed them on Delia's lawn. Peel and Bekker, who remained in their car during this process, thanked Delia for showing them the insulation and drove off.

B

Delia brought an action under 42 U. S. C. §1983 against the City, its Fire Department, Chief Wells, Peel, Bekker, Filarsky, and ten unidentified individuals, alleging that the order to produce the building materials violated his rights under the Fourth and Fourteenth Amendments. The District Court granted summary judgment to all the individual defendants, concluding that they were protected by qualified immunity. The court held that Delia had "not demonstrated a violation of a clearly established constitutional right," because "Delia was not threatened with insubordination or termination if he did not comply with any order given and none of these defendants entered

[his] house." *Delia* v. *Rialto*, No. CV 08–03359 (CD Cal., Mar. 9, 2009), App. to Pet. for Cert. 42, 48.

The Court of Appeals for the Ninth Circuit affirmed with respect to all defendants except Filarsky. The Court of Appeals concluded that the order violated the Fourth Amendment, but agreed with the District Court that Delia "ha[d] not demonstrated that a constitutional right was clearly established as of the date of Chief Wells's order, such that defendants would have known that their actions were unlawful." *Delia* v. *Rialto*, 621 F. 3d 1069, 1079 (2010). As to Filarsky, however, the court concluded that because he was a private attorney and not a City employee, he was not entitled to seek the protection of qualified immunity. *Id.,* at 1080–1081. The court noted that its decision conflicted with a decision of the Court of Appeals for the Sixth Circuit, see *Cullinan* v. *Abramson*, 128 F. 3d 301, 310 (1997), but considered itself bound by Circuit precedent and therefore "not free to follow the *Cullinan* decision." 621 F. 3d, at 1080 (citing *Gonzalez* v. *Spencer*, 336 F. 3d 832 (CA9 2003)).

Filarsky filed a petition for certiorari, which we granted. 564 U. S. ___ (2011).

## II

Section 1983 provides a cause of action against any person who deprives an individual of federally guaranteed rights "under color" of state law. 42 U. S. C. §1983. Anyone whose conduct is "fairly attributable to the state" can be sued as a state actor under §1983. See *Lugar* v. *Edmondson Oil Co.*, 457 U. S. 922, 937 (1982). At common law, government actors were afforded certain protections from liability, based on the reasoning that "the public good can best be secured by allowing officers charged with the duty of deciding upon the rights of others, to act upon their own free, unbiased convictions, uninfluenced by any apprehensions." *Wasson* v. *Mitchell*, 18 Iowa 153, 155–156

5

(1864) (internal quotation marks omitted); see also W. Prosser, Law of Torts §25, p. 150 (1941) (common law protections derived from the need to avoid the "impossible burden [that] would fall upon all our agencies of government" if those acting on behalf of the government were "unduly hampered and intimidated in the discharge of their duties" by a fear of personal liability). Our decisions have recognized similar immunities under §1983, reasoning that common law protections "'well grounded in history and reason' had not been abrogated 'by covert inclusion in the general language' of §1983." *Imbler* v. *Pachtman*, 424 U. S. 409, 418 (1976) (quoting *Tenney* v. *Brandhove*, 341 U. S. 367, 376 (1951)).

In this case, there is no dispute that qualified immunity is available for the sort of investigative activities at issue. See *Pearson* v. *Callahan*, 555 U. S. 223, 243–244 (2009). The Court of Appeals granted this protection to Chief Wells, Peel, and Bekker, but denied it to Filarsky, because he was not a public employee but was instead a private individual "retained by the City to participate in internal affairs investigations." 621 F. 3d, at 1079–1080. In determining whether this distinction is valid, we look to the "general principles of tort immunities and defenses" applicable at common law, and the reasons we have afforded protection from suit under §1983. *Imbler*, *supra*, at 418.

A

Under our precedent, the inquiry begins with the common law as it existed when Congress passed §1983 in 1871. *Tower* v. *Glover*, 467 U. S. 914, 920 (1984). Understanding the protections the common law afforded to those exercising government power in 1871 requires an appreciation of the nature of government at that time. In the mid-nineteenth century, government was smaller in both size and reach. It had fewer responsibilities, and operated primarily at the local level. Local governments faced tight

budget constraints, and generally had neither the need
nor the ability to maintain an established bureaucracy
staffed by professionals. See B. Campbell, The Growth of
American Government: Governance From the Cleveland
Era to the Present 14–16, 20–21 (1995); *id.,* at 20 (noting
that in the 1880s "[t]he governor's office staff in Wisconsin
. . . totaled five workers if we count the lieutenant gover-
nor and the janitor").

As one commentator has observed, there was at that
time "no very clear conception of a professional office, that
is, an office the incumbent of which devotes his entire time
to the discharge of public functions, who has no other
occupation, and who receives a sufficiently large compen-
sation to enable him to live without resorting to other
means." F. Goodnow, Principles of the Administrative
Law of the United States 227 (1905). Instead, to a signifi-
cant extent, government was "administered by members of
society who temporarily or occasionally discharge[d] public
functions." *Id.,* at 228. Whether government relied pri-
marily upon professionals or occasional workers obviously
varied across the country and across different government
functions. But even at the turn of the twentieth century,
a public servant was often one who "does not devote his
entire time to his public duties, but is, at the same time
that he is holding public office, permitted to carry on some
other regular business, and as a matter of fact finds his
main means of support in such business or in his private
means since he receives from his office a compensation
insufficient to support him." *Id.,* at 227.

Private citizens were actively involved in government
work, especially where the work most directly touched the
lives of the people. It was not unusual, for example, to see
the owner of the local general store step behind a window
in his shop to don his postman's hat. See, *e.g.,* Stole
Stamps, Maysville, KY, The Evening Bulletin, p. 1, Sept.
25, 1895 (reporting that "[t]he post office and general store

at Mount Hope was broken into," resulting in the loss of $400 worth of cutlery and stamps). Nor would it have been a surprise to find, on a trip to the docks, the local ferryman collecting harbor fees as public wharfmaster. See 3 E. Johnson, A History of Kentucky and Kentuckians 1346 (1912).

Even such a core government activity as criminal prosecution was often carried out by a mixture of public employees and private individuals temporarily serving the public. At the time §1983 was enacted, private lawyers were regularly engaged to conduct criminal prosecutions on behalf of the State. See, *e.g.*, *Commonwealth* v. *Gibbs*, 70 Mass. 146 (1855); *White* v. *Polk County*, 17 Iowa 413 (1864). Abraham Lincoln himself accepted several such appointments. See, *e.g.*, An Awful Crime and Speedy Punishment, Springfield Daily Register, May 14, 1853 (reporting that "A. Lincoln, esq. was appointed prosecutor" in a rape case). In addition, private lawyers often assisted public prosecutors in significant cases. See, *e.g.*, *Commonwealth* v. *Knapp*, 10 Mass. 477, 490–491 (1830); *Chambers* v. *State*, 22 Tenn. 237 (1842). And public prosecutors themselves continued to represent private clients while in office—sometimes creating odd conflicts of interest. See *People* v. *Bussey*, 82 Mich. 49, 46 N. W. 97, 98 (1890) (public prosecutor employed as private counsel by the defendant's wife in several civil suits against the defendant); *Phillip* v. *Waller*, 5 Haw. 609, 617 (1886) (public prosecutor represented plaintiff in a suit for malicious prosecution); *Oliver* v. *Pate*, 43 Ind. 132, 139 (1873) (public prosecutor who conducted a state prosecution against a defendant later served as counsel for the defendant in a malicious prosecution suit against the complaining witness).

This mixture of public responsibility and private pursuits extended even to the highest levels of government. Until the position became full-time in 1853, for example,

the Attorney General of the United States was expected to
and did maintain an active private law practice. To cite a
notable illustration, in *Hayburn's Case*, 2 Dall. 409 (1792),
the first Attorney General, Edmund Randolph, sought a
writ of mandamus from this Court to compel a lower court
to hear William Hayburn's petition to be put on the pen-
sion list. When this Court did not allow the Attorney
General to seek the writ in his official capacity, Randolph
readily solved the problem by arguing the case as Hay-
burn's private lawyer. *Ibid.*; see also Letter from Edmund
Randolph to James Madison (Aug. 12, 1792), reprinted in
14 The Papers of James Madison 348, 349 (R. Rutland,
T. Mason, R. Brugger, J. Sisson, & F. Teute eds. 1983);
Bloch, The Early Role of the Attorney General in Our
Constitutional Scheme: In the Beginning There Was
Pragmatism, 1989 Duke L. J. 561, 598–599, n. 121, 619.

Given all this, it should come as no surprise that the
common law did not draw a distinction between public
servants and private individuals engaged in public service
in according protection to those carrying out government
responsibilities. Government actors involved in adjudica-
tive activities, for example, were protected by an absolute
immunity from suit. See *Bradley* v. *Fisher*, 13 Wall. 335,
347–348 (1872); J. Bishop, Commentaries on the Non-
Contract Law §781 (1889). This immunity applied equally
to "the highest judge in the State or nation" and "the
lowest officer who sits as a court and tries petty causes,"
T. Cooley, Law of Torts 409 (1879), including those who
served as judges on a part-time or episodic basis. Justices
of the peace, for example, often maintained active private
law practices (or even had nonlegal livelihoods), and gen-
erally served in a judicial capacity only part-time. See
*Hubbell* v. *Harbeck*, 54 Hun. 147, 7 N. Y. S. 243 (1889);
*Ingraham* v. *Leland*, 19 Vt. 304 (1847). In fact, justices of
the peace were not even paid a salary by the government,
but instead received compensation through fees payable

by the parties that came before them. See W. Murfee, The Justice of the Peace §1145 (1886). Yet the common law extended the same immunity "to a justice of the peace as to any other judicial officer." *Pratt* v. *Gardner*, 56 Mass. 63, 70 (1848); see also *Mangold* v. *Thorpe*, 33 N. J. L. 134, 137–138 (1868).

The common law also extended certain protections to individuals engaged in law enforcement activities, such as sheriffs and constables. At the time §1983 was enacted, however, "[t]he line between public and private policing was frequently hazy. Private detectives and privately employed patrol personnel often were publicly appointed as special policemen, and the means and objects of detective work, in particular, made it difficult to distinguish between those on the public payroll and private detectives." Sklansky, The Private Police, 46 UCLA L. Rev. 1165, 1210 (1999) (footnotes and internal quotation marks omitted). The protections provided by the common law did not turn on whether someone we today would call a police officer worked for the government full-time or instead for both public and private employers. Rather, at common law, "[a] special constable, duly appointed according to law, ha[d] all the powers of a regular constable so far as may be necessary for the proper discharge of the special duties intrusted to him, and in the lawful discharge of those duties, [was] as fully protected as any other officer." W. Murfee, A Treatise on the Law of Sheriffs and Other Ministerial Officers §1121, p. 609 (1884).

Sheriffs executing a warrant were empowered by the common law to enlist the aid of the able-bodied men of the community in doing so. See 1 W. Blackstone, Commentaries on the Laws of England 332 (1765); *In re Quarles*, 158 U. S. 532, 535 (1895). While serving as part of this "posse comitatus," a private individual had the same authority as the sheriff, and was protected to the same extent. See, *e.g.*, *Robinson* v. *State*, 93 Ga. 77, 18 S. E.

1018, 1019 (1893) ("A member of a posse comitatus sum-
moned by the sheriff to aid in the execution of a warrant
for a felony in the sheriff's hands is entitled to the same
protection in the discharge of his duties as the sheriff
himself"); *State* v. *Mooring*, 115 N. C. 709, 20 S. E. 182
(1894) (considering it "well settled by the courts" that a
sheriff may break open the doors of a house to execute a
search warrant and that "if he act in good faith in doing
so, both he and his posse comitatus will be protected");
*North Carolina* v. *Gosnell*, 74 F. 734, 738–739 (CC WDNC
1896) ("Both judicial and ministerial officers, in the execu-
tion of the duties of their office, are under the strong
protection of the law; and their legally summoned assis-
tants, for such time as in service, are officers of the law");
*Reed* v. *Rice*, 25 Ky. 44, 46–47 (App. 1829) (private indi-
viduals summoned by a constable to execute a search
warrant were protected from a suit based on the invalidity
of the warrant).

Indeed, examples of individuals receiving immunity for
actions taken while engaged in public service on a tempo-
rary or occasional basis are as varied as the reach of gov-
ernment itself. See, *e.g., Gregory* v. *Brooks*, 37 Conn. 365,
372 (1870) (public wharfmaster not liable for ordering re-
moval of a vessel unless the order was issued maliciously);
*Henderson* v. *Smith*, 26 W. Va. 829, 836–838 (1885)
(notaries public given immunity for discretionary acts
taken in good faith); *Chamberlain* v. *Clayton*, 56 Iowa 331,
9 N. W. 237 (1881) (trustees of a public institution for the
disabled not liable absent a showing of malice); *McCor-
mick* v. *Burt*, 95 Ill. 263, 265–266 (1880) (school board
members not liable for suspending a student in good
faith); *Donohue* v. *Richards*, 38 Me. 379, 392 (1854)
(same); *Downer* v. *Lent*, 6 Cal. 94, 95 (1856) (members of a
Board of Pilot Commissioners given immunity for official
acts); *Rail* v. *Potts & Baker*, 27 Tenn. 225, 228–230 (1847)
(private individuals appointed by the sheriff to serve as

judges of an election were not liable for refusing a voter absent a showing of malice); *Jenkins* v. *Waldron*, 11 Johns. 114, 120–121 (NY Sup. Ct. 1814) (same).

We read §1983 "in harmony with general principles of tort immunities and defenses." *Imbler*, 424 U. S., at 418. And we "proceed[ ] on the assumption that common-law principles of . . . immunity were incorporated into our judicial system and that they should not be abrogated absent clear legislative intent to do so." *Pulliam* v. *Allen*, 466 U. S. 522, 529 (1984). Under this assumption, immunity under §1983 should not vary depending on whether an individual working for the government does so as a full-time employee, or on some other basis.

B

Nothing about the reasons we have given for recognizing immunity under §1983 counsels against carrying forward the common law rule. As we have explained, such immunity "protect[s] government's ability to perform its traditional functions." *Wyatt* v. *Cole*, 504 U. S. 158, 167 (1992). It does so by helping to avoid "unwarranted timidity" in performance of public duties, ensuring that talented candidates are not deterred from public service, and preventing the harmful distractions from carrying out the work of government that can often accompany damages suits. *Richardson* v. *McKnight*, 521 U. S. 399, 409–411 (1997).

We have called the government interest in avoiding "unwarranted timidity" on the part of those engaged in the public's business "the most important special government immunity-producing concern." *Id.,* at 409. Ensuring that those who serve the government do so "with the decisiveness and the judgment required by the public good," *Scheuer* v. *Rhodes*, 416 U. S. 232, 240 (1974), is of vital importance regardless whether the individual sued as a state actor works full-time or on some other basis.

Affording immunity not only to public employees but

also to others acting on behalf of the government similarly serves to "'ensure that talented candidates [are] not deterred by the threat of damages suits from entering public service.'" *Richardson*, *supra*, at 408 (quoting *Wyatt*, *supra*, at 167). The government's need to attract talented individuals is not limited to full-time public employees. Indeed, it is often when there is a particular need for specialized knowledge or expertise that the government must look outside its permanent work force to secure the services of private individuals. This case is a good example: Filarsky had 29 years of specialized experience as an attorney in labor, employment, and personnel matters, with particular expertise in conducting internal affairs investigations. App. to Pet. for Cert. 59, 89; App. 156. The City of Rialto certainly had no permanent employee with anything approaching those qualifications. To the extent such private individuals do not depend on the government for their livelihood, they have freedom to select other work—work that will not expose them to liability for government actions. This makes it more likely that the most talented candidates will decline public engagements if they do not receive the same immunity enjoyed by their public employee counterparts.

Sometimes, as in this case, private individuals will work in close coordination with public employees, and face threatened legal action for the same conduct. See App. 134 (Delia's lawyer: "everybody is going to get named" in threatened suit). Because government employees will often be protected from suit by some form of immunity, those working alongside them could be left holding the bag—facing full liability for actions taken in conjunction with government employees who enjoy immunity for the same activity. Under such circumstances, any private individual with a choice might think twice before accepting a government assignment.

The public interest in ensuring performance of govern-

ment duties free from the distractions that can accompany even routine lawsuits is also implicated when individuals other than permanent government employees discharge these duties. See *Richardson*, *supra*, at 411. Not only will such individuals' performance of any ongoing government responsibilities suffer from the distraction of lawsuits, but such distractions will also often affect any public employees with whom they work by embroiling those employees in litigation. This case is again a good example: If the suit against Filarsky moves forward, it is highly likely that Chief Wells, Bekker, and Peel will all be required to testify, given their roles in the dispute. Allowing suit under §1983 against private individuals assisting the government will substantially undermine an important reason immunity is accorded public employees in the first place.

Distinguishing among those who carry out the public's business based on the nature of their particular relationship with the government also creates significant line-drawing problems. It is unclear, for example, how Filarsky would be categorized if he regularly spent half his time working for the City, or worked exclusively on one City project for an entire year. See Tr. of Oral Arg. 34–36. Such questions deprive state actors of the ability to "reasonably anticipate when their conduct may give rise to liability for damages," *Anderson* v. *Creighton*, 483 U. S. 635, 646 (1987) (alteration and internal quotation marks omitted), frustrating the purposes immunity is meant to serve. An uncertain immunity is little better than no immunity at all.

## III

Our decisions in *Wyatt* v. *Cole*, 504 U. S. 158 (1992), and *Richardson* v. *McKnight*, 521 U. S. 399 (1997), are not to the contrary. In *Wyatt*, we held that individuals who used a state replevin law to compel the local sheriff to seize disputed property from a former business partner were

not entitled to seek qualified immunity. Cf. *Lugar*, 457
U. S. 922 (holding that an individual who uses a state
replevin, garnishment, or attachment statute later de-
clared to be unconstitutional acts under color of state law
for purposes of §1983). We explained that the reasons
underlying recognition of qualified immunity did not sup-
port its extension to individuals who had no connection
to government and pursued purely private ends. Because
such individuals "hold no office requiring them to exercise
discretion; nor are they principally concerned with en-
hancing the public good," we concluded that extending
immunity to them would "have no bearing on whether
public officials are able to act forcefully and decisively in
their jobs or on whether qualified applicants enter public
service." 504 U. S., at 168.

*Wyatt* is plainly not implicated by the circumstances of
this case. Unlike the defendants in *Wyatt*, who were us-
ing the mechanisms of government to achieve their own
ends, individuals working for the government in pursuit of
government objectives are "principally concerned with en-
hancing the public good." *Ibid.* Whether such individ-
uals have assurance that they will be able to seek protec-
tion if sued under §1983 directly affects the government's
ability to achieve its objectives through their public ser-
vice. Put simply, *Wyatt* involved no government agents,
no government interests, and no government need for
immunity.

In *Richardson*, we considered whether guards employed
by a privately run prison facility could seek the protection
of qualified immunity. Although the Court had previously
determined that public-employee prison guards were
entitled to qualified immunity, see *Procunier* v. *Navarette*,
434 U. S. 555 (1978), it determined that prison guards
employed by a private company and working in a privately
run prison facility did not enjoy the same protection. We
explained that the various incentives characteristic of the

private market in that case ensured that the guards would not perform their public duties with unwarranted timidity or be deterred from entering that line of work. 521 U. S*.,* at 410–411.

*Richardson* was a self-consciously "narrow[ ]" decision. *Id.*, at 413 ("[W]e have answered the immunity question narrowly, in the context in which it arose"). The Court made clear that its holding was not meant to foreclose all claims of immunity by private individuals. *Ibid.* Instead, the Court emphasized that the particular circumstances of that case—"a private firm, systematically organized to assume a major lengthy administrative task (managing an institution) with limited direct supervision by the government, undertak[ing] that task for profit and potentially in competition with other firms"—combined sufficiently to mitigate the concerns underlying recognition of governmental immunity under §1983. *Ibid.* Nothing of the sort is involved here, or in the typical case of an individual hired by the government to assist in carrying out its work.

\*    \*    \*

A straightforward application of the rule set out above is sufficient to resolve this case. Though not a public employee, Filarsky was retained by the City to assist in conducting an official investigation into potential wrongdoing. There is no dispute that government employees performing such work are entitled to seek the protection of qualified immunity. The Court of Appeals rejected Filarsky's claim to the protection accorded Wells, Bekker, and Peel solely because he was not a permanent, full-time employee of the City. The common law, however, did not draw such distinctions, and we see no justification for doing so under §1983.

New York City has a Department of Investigation staffed by full-time public employees who investigate city personnel, and the resources to pay for it. The City of

Rialto has neither, and so must rely on the occasional services of private individuals such as Mr. Filarsky.  There is no reason Rialto's internal affairs investigator should be denied the qualified immunity enjoyed by the ones who work for New York.

   In light of the foregoing, the judgment of the Court of Appeals denying qualified immunity to Filarsky is reversed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 10–1018

_____

## STEVE A. FILARSKY, PETITIONER *v.* NICHOLAS B. DELIA

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[April 17, 2012]

JUSTICE GINSBURG, concurring.

The Court addresses a sole question in this case: Is a private attorney retained by a municipality to investigate a personnel matter eligible for qualified immunity in a suit under 42 U. S. C. §1983 alleging a constitutional violation committed in the course of the investigation?  I agree that the answer is yes and that the judgment of the Court of Appeals holding private attorney Filarsky categorically ineligible for qualified immunity must be reversed.  Qualified immunity may be overcome, however, if the defendant knew or should have known that his conduct violated a right "clearly established" at the time of the episode in suit.  See *Harlow* v. *Fitzgerald*, 457 U. S. 800, 818 (1982).  Because the Ninth Circuit did not consider the application of that standard to Filarsky, the matter, as I see it, may be pursued on remand.

Filarsky was retained by the City of Rialto to investigate whether city firefighter Delia was taking time off from work under the false pretense of a disabling physical condition.  In pursuit of the investigation, Filarsky asked Delia to consent to a search of his home to determine what Delia had done with several rolls of insulation he had recently purchased at a home improvement store.  When Delia, on counsel's advice, refused to consent to the search, Filarsky "hatch[ed] a plan" to overcome Delia's resistance.

*Delia* v. *Rialto*, 621 F. 3d 1069, 1077 (CA9 2010). "[W]e will do it a different way," Filarsky informed Delia. App. 129; see 621 F. 3d, at 1077 ("Unable to obtain Delia's consent to a warrantless search of his house . . . , Filarsky tried a different tactic.").

Following Filarsky's advice, Fire Chief Wells ordered Delia to bring the insulation out of his house and place the rolls on his lawn for inspection. App. 158. Filarsky recommended this course, the Ninth Circuit observed, mindful that "an individual does not have an expectation of privacy in items exposed to the public, thereby eliminating the need for a search warrant." 621 F. 3d, at 1077. Delia complied with Chief Wells's order by producing the rolls, all of them unused, App. 78, 85, after which the investigation into the legitimacy of Delia's absence from work apparently ended.

In explaining why the individual defendants other than Filarsky were entitled to summary judgment on their qualified immunity pleas, the Ninth Circuit stated that "no . . . threat to [Delia's] employment" attended Fire Chief Wells's order. 621 F. 3d, at 1079. The District Court similarly stated that "Delia was not threatened with insubordination or termination if he did not comply with [the] order." App. to Pet. for Cert. 48.

These statements are at odds with the facts, as recounted by the Court of Appeals. "At the onset of the interview," the Ninth Circuit stressed, "Filarsky warned Delia that he was obligated to fully cooperate," and that "[i]f at any time it is deemed you are not cooperating then you can be held to be insubordinate and subject to disciplinary action, up to and including termination." 621 F. 3d, at 1072 (internal quotation marks omitted). Continuing in this vein, the Court of Appeals concluded that "Delia's actions were involuntary and coerced by the direct threat of sanctions including loss of his firefighter position." *Id.*, at 1077; see *id.*, at 1085 ("Delia's actions were involun-

tary and occurred as a result of the direct threat of sanctions[.]").

In further proceedings upon return of this case to the Court of Appeals, these questions bear attention. First, if it is "clearly established," as the Ninth Circuit thought it was, that "the warrantless search of a home is presumptively unreasonable," *id.*, at 1075, and that a well-trained investigating officer would so comprehend,[1] may an official circumvent the warrant requirement by ordering the person under investigation to cart his personal property out of the house for inspection?[2] And if it is "clearly established" that an employee may not be fired for exercising a constitutional right, see *id.*, at 1079,[3] is it not equally plain that discipline or discharge may not be threatened to induce surrender of such a right?

In short, the Court has responded appropriately to the question tendered for our review, but the Circuit's law will remain muddled absent the Court of Appeals' focused attention to the question whether Filarsky's conduct violated "clearly established" law.

———————

[1] Delia also suggests that Filarsky's conduct should be measured against a "reasonable attorney" standard: whether an attorney providing advice in a public-employee investigation should have known that the search of Delia's personal property, stored in his home, would be lawless. See Brief for Respondent 45–46.

[2] An additional inquiry may be appropriate: Although conceived as a substitute for a warrantless entry, should the inspection order Filarsky counseled pass muster as a permissible discovery device? Cf. *Oklahoma Press Publishing Co.* v. *Walling*, 327 U. S. 186, 195, 208–211 (1946) (subpoena *duces tecum* for a corporation's business records, authorized by §9 of the Fair Labor Standards Act, encountered no Fourth Amendment shoal).

[3] The Ninth Circuit referred to cases holding that public employees' job retention cannot be conditioned on relinquishing the Fifth Amendment's safeguard against self-incrimination: *Uniformed Sanitation Men Assn., Inc.* v. *Commissioner of Sanitation of City of New York*, 392 U. S. 280 (1968), and *Gardner* v. *Broderick*, 392 U. S. 273 (1968).

# SUPREME COURT OF THE UNITED STATES

_____

No. 10–1018

_____

## STEVE A. FILARSKY, PETITIONER *v.* NICHOLAS B. DELIA

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[April 17, 2012]

JUSTICE SOTOMAYOR, concurring.

The Court of Appeals denied qualified immunity to Filarsky solely because, as retained outside counsel, he was not a formal employee of the City of Rialto. I agree with and join today's opinion holding that this distinction is not a sound basis on which to deny immunity.

I add only that it does not follow that *every* private individual who works for the government in some capacity necessarily may claim qualified immunity when sued under 42 U. S. C. §1983. Such individuals must satisfy our usual test for conferring immunity. As the Court explains, that test "look[s] to the 'general principles of tort immunities and defenses' applicable at common law, and the reasons we have afforded protection from suit under §1983." *Ante,* at 5 (quoting *Imbler* v. *Pachtman*, 424 U. S. 409, 418 (1976)).

Thus in *Richardson* v. *McKnight*, 521 U. S. 399 (1997), we denied qualified immunity to prison guards who were privately employed, despite their quintessentially public function. We did so because we found "no special reasons significantly favoring an extension of governmental immunity" in that context. *Id.,* at 412. We left open, however, the question whether immunity would be appropriate for "a private individual briefly associated with a government body, serving as an adjunct to government in an

essential governmental activity, or acting under close official supervision." *Id.,* at 413.

Filarsky, supported by the United States as *amicus curiae*, contends that he fits into this coda because he worked in close coordination with and under the supervision of City employees. Whether Filarsky was supervised by those employees, and did not himself do the supervising, is unclear. But there is no doubt that Filarsky worked alongside the employees in investigating Delia. In such circumstances, I agree that Filarsky should be allowed to claim qualified immunity from a §1983 suit. As the Court's opinion persuasively explains, there is a "'firmly rooted' tradition of immunity" applicable to individuals who perform government work in capacities other than as formal employees. *Id.,* at 404; see *ante,* at 5–11. And conferring qualified immunity on individuals like Filarsky helps "protec[t] government's ability to perform its traditional functions," and thereby helps "protect the public at large." *Wyatt* v. *Cole*, 504 U. S. 158, 167–168 (1992). When a private individual works closely with immune government employees, there is a real risk that the individual will be intimidated from performing his duties fully if he, and he alone, may bear the price of liability for collective conduct. See *ante,* at 12; see also *ante,* at 13 (noting distraction caused to immune public employees by §1983 litigation brought against nonimmune associates).

This does not mean that a private individual may assert qualified immunity *only* when working in close coordination with government employees. For example, *Richardson*'s suggestion that immunity is also appropriate for individuals "serving as an adjunct to government in an essential governmental activity," 521 U. S., at 413, would seem to encompass modern-day special prosecutors and comparable individuals hired for their independence. There may yet be other circumstances in which immunity

SOTOMAYOR, J., concurring

is warranted for private actors. The point is simply that such cases should be decided as they arise, as is our longstanding practice in the field of immunity law.